The plaintiff, at the time of commencing (829) its actions (afterwards consolidated and tried as one against the defendant, a corporation) issued and levied attachments upon certain real and personal property which it alleged belonged to the defendant. The National Bank of Asheville, the Battery Park Bank and the Western Carolina Bank, the appellees, intervene and claim the personal property attached by virtue of an alleged purchase by them from the defendant on 4 November, 1891, twenty days before the attachment was levied. The only matter for our decision is whether that sale and purchase constituted a valid transaction and passed the title to the property to the intervenors. The intervenors, having to show by preponderance of testimony their title to the property took upon themselves that burden and attempted to show a valid sale to them, at a fair price, by an agent of the defendant. The verdict of the jury establishes the sufficiency of the price agreed on as a fair one and there is no contention over that matter. It is admitted by all parties that the property which the intervenors claim under the alleged sale embraces the entire stock of manufactured goods (furniture) which the defendant had on hand, at the time of the sale, valued at about $19,000, and also a lot of flooring valued at about $3,000. W. W. Avery, the defendant's agent, who made the alleged sale to the intervenors, testified that he got a full price for it, but explains that the intervenors were creditors of the defendant, some of the debts not being due at the time of the sale, and that they took the property at the price agreed on, $22,081.11, "as a payment on their debts." The witness Avery in writing to the secretary of the defendant corporation, two days after the alleged sale, made the following statement of the transaction:
(830)
ASHEVILLE, N.C. 6 Nov., 1891.
MR. WM. EDMINSTON, Knoxville, Tenn.
Dear Sir: As telegraphed you last night, the three banks here, acting together, attached for the overdue debts due them. But they have not sued us individually and I do not think they will, if we can make the property pay them out. They were all cocked and primed for me when I went up yesterday afternoon to meet them at five o'clock, had all the papers issued and ready to serve. I wanted to get some time but they would not consent to give me any, as they seemed to be afraid some other creditor would come down on us and get the drop on us before they did. They were going to attach everything we had, and I knew if they did so and got all our property into the hands of a receiver, it would be sacrificed to such an extent that it would *Page 486 
never come anywhere near paying our debts, as all of the creditors of the concern would be treated alike by the receiver, there would be a great deal of paper left unpaid with our personal indorsement on it, and on this paper we would be sued and none of us ever get out from under the load of debts and judgments that would be piled up against us. So, I asked them if they would be willing to take our furniture and lumber as a payment on the paper which they held against us and on which we were individually indorsed, and give us an opportunity to sell it for them and get as much out of it to pay on these papers as we could. After consulting some time they agreed to do this and I made the sale to them, as it was the only thing left for me to do, and seemed to be the best thing I could do for all of us . . . . ; but they still insisted upon attaching our real estate and other property for the overdue debts, in order, as they said, to make themselves secure. This they did yesterday afternoon and our factory is now in the hands of the sheriff. To-day they seem to feel that their debts against us (831) are secure, and, while I do not know positively, I think they will be inclined to let us work it out, if we feel so disposed, and make the property pay them as much as we can of their debts; but they have come down on us so suddenly and unexpectedly that I have no confidence left in any of them. . . . ."
The question now arises, did W. W. Avery have authority to dispose of the property in the manner in which he did? As to his general powers, he was the treasurer of the company and he testified that he "sold all the furniture manufactured at the works of the company," and "used the proceeds of sale for the benefit of the company in carrying on its general business"; that "it was agreed that he should stay at Asheville and run the business; that from the formation of defendant company he had charge of it, managed it, sold its furniture, borrowed money for it and paid its debts"; that he had done this "for two years and up to the date when the furniture in question was sold to the intervenors without any objection from the directors or stockholders of corporation, but with their full knowledge and consent, and that he managed all the affairs of the company." And it is also contended for the intervenors that if the alleged sale by Avery was outside the scope of his general powers, described as above, his conduct was nevertheless authorized by the directors of the defendant corporation, who afterwards met at Cincinnati and "talked over informally the business of the company; that it owed a large amount of debts and that the directors would have to make some arrangements to meet them as they became due, which would be at an early day." The particular authority thus given him is then stated by the witness: "They all agreed and so instructed me to come back to North Carolina, sell the furniture *Page 487 
we then had on hand and apply the proceeds to the payment (832) of the company's debts here with a view of removing the plant to Lenoir City, Tenn."
We think that the agent Avery, transcended his powers as claimed for himself by his own testimony when he attempted to make such a disposition of the property of the corporation as this transaction discloses, and therefore that no title to the property passed to the intervenors in the attempted sale. Avery claimed, and the testimony shows, that he had very large powers in the active management for which the company was organized, the manufacture and sale of furniture, but we cannot find from a reading of the whole testimony that the company ever entrusted him with the power to do what he attempted to do in the transaction above set forth. His agency concerned the running and continuation of the business. By this act he practically put an end to it. Under his powers he was to sell the product of the defendant manufacturing company, purchase material for its use, borrow money and pay its debts. He was not authorized to take the entire stock of furniture and also a large quantity of lumber, agree upon a value for it with certain of the creditors of the corporation, turn the property over to them and have the value placed upon its indebtedness, some of which was not due, as a credit. Which thing he did. At the time of the attempted sale the agent gave to the preferred creditors (the intervenors) information concerning the company's matters, showing its large indebtedness and its inability to pay the same, which resulted in the immediate action of the creditors, the intervenors, by attachment of the other property of the defendant, and thereby closing up the business of the company. However broad may be the general power of an agent to conduct the business of a manufacturing corporation, it cannot, in reason, be extended to cover such a transaction as the one which the agent in this matter attempted to perform. Neither were the special instructions which Avery claims were given to (833) him by the directors at Cincinnati, such as to confer upon him the power which he exercised in the attempted sale to the banks, the intervenors. He says he was authorized to sell the furniture which was then in hand and "apply the proceeds of sale to the payment of the debts here" (in North Carolina). This did not empower him to dispose of the entire stock and also of some $3,000 worth of unmanufactured material as a part payment on debts to certain of defendant's creditors, some of which were not due. It therefore follows that Avery had neither general nor special authority to transfer to the intervenors the property in dispute, and that because of his want of authority to do so, they took no title thereto. Owing to the unusual and extraordinary disposition of the property of the defendant corporation which *Page 488 
the agent was attempting to make, the other parties to the transaction (the intervenors) were put on their guard, and they should have been particularly careful to find out the agent's power; more especially as in the matter he was attempting to relieve himself of personal liability on account of his indorsement of the notes which the banks held against the company. There was certainly enough in this transaction to have excited suspicion of lack of authority of the agent, and they should have clearly scrutinized his powers. Therefore it follows that in his Honor's refusal to instruct the jury, as he was requested to do by the plaintiff, that there was "no competent evidence that W. F. Avery had authority to sell the furniture as attempted in this case," there was error and on account of this error there must be a new trial.
But the intervenors contend that if Avery did transcend his powers, yet his action was afterwards ratified by defendant corporation, and by this ratification any defect in their title to the property, if there was any, was cured. Certainly the defendant could have ratified (834) the acts of its agent and by so doing make valid an act which without such ratification would have been invalid. But, in seeking to cure such a defect in the act of their agent and alleging that the ratification took place at a meeting of the directors, it must be first shown that the meeting was a legal one. It is said that the alleged ratification was made at the Glen Rock Hotel in Asheville. The intervenors' evidence in regard to that meeting is as follows: Avery said, "I think there was a notice given of the meeting of the company at Glen Rock Hotel, am not sure of that, however. The Glen Rock Hotel was not the usual place of the meeting of the company, but was the most convenient place inasmuch as two of the directors were already there. The meeting at this hotel was regularly organized at the suggestion of Carter, and the sale of the furniture to the banks was discussed and approved by the meeting." Carter's testimony concerning this meeting, was as follows: "The directors of defendant company met at Glen Rock Hotel in Asheville; the meeting was organized by the president and secretary, with a majority of the directors present. I explained to them, as attorney of the company, the sale of the furniture made to the banks; all of the directors in the meeting approved of the sale. Avery held the stock of the Tennessee company of about $100,000, which they said they wished to transfer to the banks in liquidation of the company's indebtedness to the banks. After the meeting was informed of this sale of the furniture to the banks they directed Avery to destroy that stock, which he did by tearing it up in my presence. I do not know that there was any previous notice of the Glen Rock Hotel meeting given to the directors of the company." The testimony shows that the board of directors of defendant company *Page 489 
consisted of five members, Avery being one of them, and that he and two others were present at this meeting. Here then were three out of five directors at an unusual place and time for holding (835) the meetings of the company, without notice to the other directors, so far as appears from the testimony. Was such an assemblage a meeting of the corporation in any legal sense? We cannot think so. "Unless the meeting is one that assembles at stated times, pursuant to some provision in the constitution or by-laws, it must be duly notified to all the directors. For even if a majority of a total number of directors were present and the vote is unanimous, so that the votes of the absentees could not have changed the result, it does not follow that those actually present would not have voted differently, had they heard what the absentees, if present, might have said. To make the proceedings regular, all should have had an opportunity to be present and take part in them." Taylor Corporations, sec. 260. And even though it be taken as true that the usual presumption in favor of regularity applies to the directors' meetings, and that the burden of proof to show a want of due notice of the meetings is on the party impeaching the regularity, yet we think the presumption was rebutted by the admission of the intervenors that the assemblage of a majority of the directors was at an unusual place, at an unusual time, and that no record of such meeting was produced or alleged to exist; and that under all the circumstances of this meeting of a majority of the directors, as proved by the intervenors' witnesses, it was incumbent on them, when they sought to show that the corporation by that meeting had ratified the act of the agent in disposing of the property in dispute, to show actual notice of the meeting given to each director. Upon the question of ratification his Honor's charge was as follows: "Now, Avery and Carter testified that at a meeting at Glen Rock Hotel there was a gathering of a majority of the directors (836) of the Asheville company and that then this board undertook to ratify Avery's acts. The question is, was that a lawful meeting and had it the power to ratify? The evidence is somewhat equivocal and not so certain that they attempted to organize, and the evidence of Carter is that he knew of no notice, but there is no evidence that there was none. As I told you before, men having a duty to perform are presumed to do that duty rightly and to take all necessary steps in its right performance, and as you have heard all the evidence on this point I will leave it with you to say whether there was a lawful meeting of the board there or not. Against it you will note that Carter said he knew of no notice, and you will remember that he said that the meeting was organized at his suggestion and at an unusual place for the directors to meet, a place where they never met before. It also *Page 490 
appears that this board was somewhat uncertain in its method of holding its meetings, that they were in the habit of meeting at various places, and against this stands the presumption I have mentioned before, that men act according to law, and if upon the whole evidence you believe this was a lawful meeting, then it was lawful; but if not, it goes for nothing, so far as ratification is concerned, but can be used for the purpose of contradicting these men, because they were then attempting to approve of this very sale. If you find this was an unlawful meeting, it is not to be considered for the purpose of proving ratification, but to contradict these men."
The plaintiff excepted because, first, "The Judge should have charged the jury that the meeting at Glen Rock Hotel was not lawful," and second, "Because there was no evidence to warrant the Judge in submitting to the jury the question whether or not the meeting at Glen Rock Hotel was lawful." Our opinion is that, upon the undisputed facts concerning the assembling of the majority of the directors at Glen (837) Rock Hotel, there was no such meeting in law of the governing and directing body of the defendant corporation as to make its acts and conclusions the acts and conclusions of the corporation, binding on it and its creditors, as a ratification of an otherwise invalid act.
There was error in his Honor's refusal to charge on the matter of ratification as he was requested to do by the plaintiff.
After what has been said in this opinion it seems unnecessary to discuss any other of the exceptions filed by the plaintiff.
New Trial.
AVERY, J., did not sit on the hearing of this case.
Cited: S. c., 120 N.C. 476; Bank v. Furniture Co., 122 N.C. 752;Glass Plate Co. v. Furniture Co., 126 N.C. 889. *Page 491