# HAROLD F. HADDEN et al. *vs.* CHARLES H. LINVILLE, Garnishee of the NATCHAUG SILK CO.

*Corporations—Power of General Manager to Transfer Property of an Insolvent Corporation to Secure Antecedent Indebtedness— Foreign Receivers—Evidence—Attachments—Date of Affidavit.*

The President or General Manager of a corporation which is insolvent and is about to go into the hands of a receiver has no power as such and without express authority to transfer the assets of the corporation to a creditor thereof for the purpose of paying an antecedent debt, although a by-law of the company provides that he shall have entire charge of the business subject to the order of the board of directors.

A President or managing agent of a corporation can bind the same only by such acts and contracts as are within the ordinary course of business; and his acts beyond the scope of his general duties are not binding unless they have been previously authorized or are subsequently ratified.

When a party buys goods from the agent of a corporation, paying a consideration for the same, without notice that such agent exceeded his authority, the company is estopped from denying the authority of such agent to make the sale. But this rule does not apply when an agent transfers property as collateral security for an antecedent indebtedness, without being thereunto authorized.

The authority of an officer of a corporation to do a particular act may be inferred from the fact that he has habitually assumed and exercised such power.

Property situated in this State belonging to a foreign corporation is liable to attachment here at the suit of a creditor thereof, although a receiver has been appointed for such corporation in the State of its domicil.

The N. Co., a Connecticut corporation, was indebted in a large amount to a bank there situated. The General Manager came to this State with an agent of the bank, and notified the defendant, an agent of the N. Co. here, who had in his possession a quantity of goods belonging to the corporation, that this property was transferred to the bank. Defendant agreed to hold the same for the bank and account to it for the proceeds. The N. Co. was then insolvent and the object of its General Manager was to secure the payment of its existing indebtedness to the bank, but his acts were not previously author-

ized by the company nor were they subsequently ratified. After-wards, plaintiffs, creditors of the N. Co., sued out an attachment and laid the same in the hands of the defendant. *Held,*

1st. That the General Manager had no authority to transfer the prop-erty of the company to the bank to secure said existing indebtedness.

2nd. That the property so attempted to be transferred was liable to attachment in this State by the plaintiffs.

3rd. That the garnishee could be asked on cross-examination as to the conversation between him and the General Manager relating to the transfer of the property, the question in the case being as to the own-ership of the goods at the time the attachment was issued.

The fact that the affidavit upon which an attachment was issued ap-pears upon the face of the proceedings to have been made several months before the institution of the suit, does not affect the jurisdic-tion of the Court to sustain the attachment, since the statute does not require the affidavit to be made at any particular time before the issue of the writ.

Appeal from the Superior Court of Baltimore City (WRIGHT, J.) The Natchaug Silk Company was a Con-necticut corporation with its principal place of business in Willimantic. Risley, the cashier of the First National Bank of Willimantic, was a director of the Silk Company, and managed its finances. The Silk Company kept all its de-posits at the bank and made all its discounts there, all through Risley. The bank, whose capital was only one hundred thousand dollars, soon began to lend to the Silk Company amounts in excess of the ten thousand dollars' limit fixed by the National Banking Act, and on January 1, 1890, at a time when the Silk Company was insolvent. Risley induced Chaffee to give the bank what purported to be a bill of sale of goods of the Natchaug Silk Company, to the amount of $26,610.24, as security for such advances. There was, however, no change of possession of said goods, the bill of sale was not recorded, and the Silk Company with the consent of the bank went on disposing of these goods without regard to the alleged bill of sale. This alleged sale was not made known to the board of directors of the Silk Company. The bank went on lending to the Silk Company, so that in the spring of 1892, the debt of the

Silk Company to the bank was over $200,000. The alleged
amount of indebtedness to the bank, as set down in the .
safeguard ledger of the Silk Company, was $312,195.26
on Dec. 1, 1893, and was $319,926.59 on April 25, 1895.

On or about January 15, 1894, Mr. Risley got Chaffee
to execute two more bills of sale of certain goods of the
Natchaug Silk Company to the amount of about $66,000
as security for the indebtedness of the Silk Company to the
bank.   But in this case, also, there was no change of pos-
session ; the goods were not separated from the other stock
of the company, and were used as the business of the com-
pany required.    These attempted liens were not made
known to the board of directors of the Silk Company.    It
was after the 1st of December, 1894, that the plaintiffs
herein delivered raw silk to the Silk Company to the amount
of about $20,000.    Risley died on the 12th day of April,
1895, and the affairs of both the bank and the Silk Com-
pany reached a crisis.   In order to protect the bank, Chaffee
made arrangements to transfer all the goods in New York,
Chicago and Baltimore to the bank, even sending $20,000
of goods out of Willimantic to New York for this purpose.
It was a part of Fenton's business to attend to shipping of
goods from the mill.    Chaffee, in giving Fenton the order
to ship these goods, said nothing to him about sending them
on account of the First National Bank, but gave to Fenton
the excuse that, as the Silk Company could no longer get
accommodations from the bank, it must raise money, and
for that purpose must ship all the goods possible to New
York.

On Monday, the 22d April, 1895, Chaffee went to Boston
and ordered all the Silk Company's goods there to be
shipped to New York.    He then returned to Willimantic,
and, without telling any of the directors of the Silk Com-
pany what he was going to do, Chaffee went to New York,
where he attempted to transfer to the bank the Silk Com-
pany's goods in New York.    On the afternoon of the 23d,
Chaffee left for Chicago, and on the 25th of April, 1895,

he attempted to transfer the goods in Chicago to the bank. On the afternoon of April 26th, 1895, Chaffee arrived in Baltimore, where he attempted to transfer to the bank the goods in question. The bank had closed its doors on April 22d, before Chaffee left for Boston, and was in charge of the examiner, Dooley, who, on the 23d April, was duly appointed receiver by the Comptroller of the Currency.

On Friday, April 26th, prior to the attempted transfer of the goods in Baltimore, James E. Hayden was appointed receiver of the Silk Company, on application of Barrows. On April 29th, Chaffee assembled together, in the office of the Silk Company, such of the directors of the Silk Company as were attainable, including Fenton, Wilson and Fowler, and informed them of what he had done on his trip, and tried to get them to ratify his action. Dooley and Lucas were also present, and persistently urged the directors to ratify Chaffee's acts, saying that "it was very important." But they each and all refused to ratify the same.

The evidence of the attempted transfer in Baltimore was solely the testimony of the defendant Linville, the garnishee. He testified that up to the 26th day of April, 1895, he had been the agent of the Silk Company in Baltimore, and on that day had in his possession, as agent for the Natchaug Silk Company, the goods in question, the subject of this suit. That on the 26th day of April, 1895, Chaffee told him that to make good a claim that the bank had against the Silk Company, the goods in Baltimore had been transferred to Mr. Dooley, and asked if he, Linville, would represent the bank in the sale of the goods; that a Mr. Lucas, who claimed to represent Mr. Dooley, gave him an order to hold the goods for Mr. Dooley, and under that order he continued to hold the goods for Mr. Dooley, as receiver. Linville further testified that there was no change of possession; that he held the goods exactly as he did before the 26th day of April, 1895, and continued to sell them as he did before that time.

The complainants laid an attachment on the goods on the

22d day of May, 1895, and subsequent to that date Linville sold the goods, the proceeds to be held subject to the attachment suit. The attachment suit of May 22d, 1895, was caused to be dismissed by the plaintiffs themselves, owing to some technical defect on Dec. 27th, 1895, and on the same day the present suit was brought.

The Court below instructed the jury that there was no sufficient evidence that the garnishee had at the time of laying the attachment, or at any time since has had, any goods or credits of the defendant in his hands and that therefore their verdict must be for the garnishee on the second issue (*nulla bona*).

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, PAGE and BOYD, JJ.

*Henry B. Twombly* (with whom were *Nicholas P. Bond*, *Edward Duffy* and *William B. Putney* on the brief), for the appellants.

I. First National Bank of Willimantic, Dooley, its receiver, and the garnishee, Linville, acting on behalf of said Dooley, are estopped from asserting any title to the goods in question as against the plaintiffs, for the reasons: (*a*). The goods in question were made up largely out of raw silk obtained from the plaintiffs on credit by means of false and fraudulent representations. (*b*). The bank, being vitally interested in securing credit for the Silk Company, then insolvent, not only knew that plaintiffs' goods were obtained by false and fraudulent representations, but in fact participated in making them, and arranged and planned to secure a benefit to itself thereby. The present claim of title by the bank to the goods in question is made with a view to secure to the bank the fruits of such fraud upon the complainants. (*c*). The bank, whose very life depended upon the continuance of the Silk Company, united with the Silk Company in fraudulently concealing the existence of the bills of sale to said bank of Jan. 1, 1890, and Jan. 14 and 15, 1894, in order to get for the Silk Company credit with the plaintiffs

which otherwise the Silk Company could not have obtained. This misconduct of the bank caused the loss to the plaintiffs. The attempted transfer in Baltimore of April 26th, 1895, being in continuance of said fraudulent scheme, is therefore fraudulent and void as to the plaintiffs.

II. The transfer of the goods in Baltimore by Chaffee, the president of the Silk Company, was fraudulent as against the plaintiffs.

But, further, Chaffee had no right or authority, either as president or general manager of the Silk Company, without specific authority from the board of directors of the Silk Company, at a time when the Silk Company was insolvent and had stopped business, to create a preference in behalf of one particular creditor of the Silk Company chosen by himself, without the knowledge or consent of the board of directors of the Silk Company.

*First*.—The facts show conclusively that the transfer in Baltimore of April 26th, 1895, was part and parcel of a long-continued fraudulent scheme to create a lien in favor of the bank at the expense of all the other creditors of the Silk Company in collusion with the bank. The said transfer was made secretly by Chaffee conspiring with the bank, and in such manner as to purposely conceal his fraudulent purpose from the other directors of the Silk Company. The bank cannot therefore successfully rely upon fraudulent acts to give it title as against these plaintiffs.

*Secondly*.—In the absence of special authority conferred upon Chaffee either as president or general manager for that purpose by the board of directors of the Silk Company, he had no power to make a preference in favor of the bank, and the transfer of April 26th, 1895, was and is void. It might be that under such circumstances a preference could have been given to the bank by the board of directors of the Silk Company, but as specific authority was not given to Chaffee, he had no authority either as president or general manager to make the transfer in question. The owners of the property of the Silk Company were the stockholders,

who act through the board of directors. The officers of
the company are the agents with authority to act only in
accordance with the powers actually conferred on them.
The by-laws of the Silk Company provided as to the duties
of the president as follows : " The president shall preside at
all meetings of the stockholders of the company, when
present, and in his absence the meeting shall be called to
order by the secretary and a president *pro tem.* appointed.
He shall also perform all duties specially required of him by
the Statute Laws of this State, but his charge of the exe-
cutive business of the company shall be subject to the
control of the directors."

The by-laws further provided as to the duties of manager :
" The board of directors shall annually elect a general
manager, who shall have entire charge of the business and
affairs of said company, subject to the order and approval
of the board of directors."

Thus the power of the president and general manager
was made expressly subject to the control, order and ap-
proval of the board of directors. There is some testimony
in the case to the effect that Chaffee was allowed to con-
duct the affairs of the company, *when a going concern*, as
he pleased, but the evidence does not sustain the garnishee's
broad claim of unlimited authority on Chaffee's part. The
minutes of the directors of the company have been put in
evidence and it appears from them that everything of im-
portance was passed upon by the board of directors.

In *Hyde* v. *Larkin*, 35 Mo. App., 365, 371, the Court
said in a case where the president and general manager of
a company assigned a chose in action of the company to a
creditor as security for a debt: "I am firmly persuaded
that the president, general agent or manager of a mining
corporation cannot, by virtue of his office merely assign
the assets of the corporation. He must have some warrant
from the charter, the directory or the custom and usage of
the corporation. It is certainly the safer and more con-
servative rule and commends itself to sound reason. If it

were not so, such officer might act in disregard of the board of directors, and might, by the mere power inherent in his office, transfer the entire assets of the corporation. The proposition is supported by the weight of authority." See also *England* v. *Dearborn,* 141 Mass. 590 ; *Bank* v. *Company,* 116 N. C. 827 ; *Dooley* v. *Sheriff of Cook Co.,* 29 Chicago Legal News, 231 ; *Norton* v. *Bank,* 14 South. Rep. 872 ; *Goodyear Rubber Co.* v. *Scott Co.,* 96 Ala. 639 ; *Nat. Bank* v. *Vigo Bank,* 141 Ind. 352 ; 4 *Thompson on Corp.,* secs. 4622, 4618, 4627, 4632 ; *Comacher* v. *Hamilton Bank Note Co.,* 2 App. Div. 369 ; *Hoyt* v. *Thompson,* 5 N. Y. 320 ; *Luse* v. *Isthmus, T. R. Co.* 6 Ore. 125 ; *Walworth, &c., Bank,* v. *Farmers' &c., Co.,* 14 Wisc. 325.

III. By the appointment of the receiver of the Natchaug Silk Company on the 26th day of April, 1895, the authority of Chaffee to act in any way for the silk Company ceased at once. The subsequent transfer of the goods in Baltimore by Chaffee was therefore absolutely void and of no effect.

The order appointing the receiver of the Silk Company was signed at 8.40 A. M., Friday, April 26th, 1895, and the receiver took possession of the factory and goods in Willimantic between 9 and 10 A. M. of same day. Chaffee arrived in Baltimore in the afternoon of Friday, April 26th, 1895, and the transfer was made that afternoon. The rule of law is that by the appointment of a receiver of a corporation the authority of its officers to act as agents for the corporation ceases at once. *High on Receivers,* sec. 289 ; *Beach on Receivers,* p. 466 ; *City of Rochester* v. *Bronson,* 41 How. Pr. 82 ; *Louisville R. Co.* v. *Cauble,* 46 Ind. 277 ; *Lenoir* v. *Improvement Co.,* 117 N. C. 471 ; *Franzen* v. *Zimmer,* 90 Hun. 107.

As between the Connecticut receiver of the Silk Company and the plaintiffs, who are residents of New York State, there can be no question as to the legality and priority of the plaintiffs' attachment lien on goods of the Silk Company in Maryland. The receiver is not a party to this action and makes no claim to the goods in question as against the

plaintiff. *Beach on Receivers*, page 269, lays down the rule that the powers of a receiver is co-extensive only with the territorial jurisdiction of the Court appointing him ; but because of "judicial comity," a receiver of one State or jurisdiction will be recognized and permitted by the Courts of another to do all that is necessary to take and possess the property of the debtor there located, provided that to do so will not violate any law or policy of the latter, or embarrass or do injustice to any of its citizens "*or those of a third State* who have come there to enforce the payment of their claims against the debtor" (see cases cited). *John Ray Clark Co.* v. *Toby Valley Supply Co.*, 3 Pa. D. R. 518, held that citizens of a third State may sue out attachments and hold the property of the insolvent in a State other than the one in which the receiver is appointed because they are "within the words and spirit of the first clause of the second section of the fourth Article of the Constitution of the United States, that the citizens of each State shall be entitted to all the privileges and immunities of citizens of the several States. *President, &c., of Manhattan Co.* v. *Maryland Steel Co.*, 31 W. L. B. 100 ; *Catlin* v. *Wilcox Silver Plate Co.*, 123 Ind. 477.

*Wm. Reynolds* and *Paul M. Burnett*, for the appellee.

The vital question in the case is, whether the Court was right in granting the prayer of the garnishee to take the case away from the jury, for unless the plaintiffs can show that there was an error in this instruction their appeal cannot be sustained, It was declared by this Court in the case of *Odena'hal* v. *Devlin*, 48 Md. 439, 454, to be well settled law in Maryland that as a general rule in attachment cases "the right of the attaching creditor to recover against the garnishee depends upon the subsisting rights between the garnishee and the debtor in attachment, and the test of the garnishee's liability is that he has funds, property or credits in his hands belonging to the debtor for which the latter would have a right to sue." Applying the test to the case

at bar it results that in order to recover against the garnishee the plaintiffs must establish by affirmative proof that the Natchaug Silk Company could recover, if it were suing the garnishee, for the goods or money to which it is sought to have condemnation of under this attachment. It is true there are a few exceptions to this general rule which are enumerated in the cases of *Odend'hal* v. *Devlin*, but this case cannot be brought within any one of them.

Whatever rights the defendant Silk Company could claim against the garnishee, Linville, in the property now in his hands, have now matured as fully as they ever will, and are legal rather than equitable in their nature and therefore the only one of the exceptions to the general rule mentioned by this Court in its opinion above cited which could possibly be applicable to the case at bar, is where "if the debtor has fraudulently conveyed property to another the *grantee* may be charged as garnishee though the fraudulent grantor could not maintain a suit." This exception is intended to cover those cases only where the defendant has, with the fraudulent intent of covering it up from his creditors, made a colorable transfer of his property *to the garnishee* upon a secret understanding that it shall be held for his own benefit. Although in such a case the defendant would be estopped from setting up his own fraud in order to defeat the title thus vested in the garnishee, his creditors would not be and the transfer would be void as against them. See *Nicrosi* v. *Irvine*, 102 Ala. 648 ; 48 Am. St. Rep. 92. In this case there can be no pretence of fraudulent collusion between the defendant and the garnishee, for the transfer was made not to the latter, but to the receiver of the bank in part satisfaction of a *bona fide* existing indebtedness to the bank. Even had the bank or its receiver been the garnishee instead of Linville, which would have made a much stronger case for the plaintiffs, their attachment must have been defeated because the transfer of the property to the receiver would in that case have been perfectly valid as against the other creditors of the Silk Company.

It has long been recognized as well settled in Maryland that, to quote the language of this Court in *Castleberg* v. *Wheeler*, 58 Md. 266, 275, "by the common law, transfers, conveyances and charges by a debtor to, or in favor of *bona fide* creditors are valid, though the debtor may be at the time or intends soon to become utterly insolvent and makes the charge for the sole purpose of giving a prefer-ence over his other creditors who may not be able to realize any part of their claims." This common law right of the debtor has only been restricted by legislation in Maryland in cases where he either is proceeded against under, or ap-plies for the benefit of the State Insolvent Law within four months after making the transfer, and nearly two years have now elapsed since the transfer of title testified to by the garnishee as having been made on April 26, 1895. To the same effect see the following Maryland cases : *Cole* v. *Albers*, 1 Gill, 422 ; *Powles* v. *Dilley*, 9 Gill, 230 ; *Rich* v. *Levy*, 16 Md. 77, 84 ; *Syester* v. *Brewer*, 27 Md. 312 ; *Fuller* v. *Brewster*, 53 Md. 361 ; *Totten* v. *Brady*, 54 Md. 170. So also the same law prevails in Connecticut : *Smith* v. *Skeary*, 47 Conn. 47.

It was strongly contended by the plaintiffs in the Court below, that inasmuch as there was evidence tending to show that they had been induced to give credit to the Silk Com-pany upon the strength of false and fraudulent representa-tions as to its financial condition made by Risley, one of its directors who managed its finances and who was also the cashier of the First National Bank of Williamantic, there-fore the bank was chargeable with notice of the frauds thus practised by Risley upon the plaintiffs, and must therefore be held to have participated in them, and con-sequently would be thereby estopped from setting up any claim to have any part of the assets of the Silk Company applied in payment of its debts until after the entire indebted-ness of the Silk Company to the plaintiffs which had been incurred through the fraud of the bank had been first fully satisfied. Without pausing to show the fallacy of the

reasoning by which it is sought to arrive at this conclusion, it is sufficient to point out that one of the premises upon which it is founded is entirely false, viz. : that the bank is chargeable with notice of or can be held in any way responsible for false representations made by Mr. Risley as an officer of the Silk Company to the plaintiffs simply because he happened to be also the cashier of the bank.  It is a well settled rule of law that the knowledge of an officer of a corporation who is acting fraudulently against third parties can only be imputed to the corporation when he is acting *for it*, and that it can only be held responsible for such of his fraudulent acts as he may have been guilty of while acting in the line of his duty as its officer.  *Winchester* v. *Balto. & Susque. R. R. Co.*, 4 Md. 231, 239.

The test therefore of the plaintiffs' right to a condemnation of the property held by the garnishee at the time they laid this attachment must be the answer to the question : Could the defendant have recovered from the garnishee for that property if he had actually turned it over to the receiver of the bank as he was directed to do by Mr. Chaffee, the president and general manager of the company ? Under the authorities above cited the Natchaug Silk Company had undoubtedly the right to make the transfer of its goods in Linville's custody in Baltimore, to the bank or its receiver in part satisfaction of a *bona fide* indebtedness, unless there was something in the decree of the Connecticut Court passed on the same day appointing a receiver, which prevented it from doing so.  It is true that this decree by its terms assumed to invest the receiver " with the title to all the estate and property of every nature belonging to said corporation, real and personal, corporeal and incorporeal," but whatever effect this decree might have upon the title of property of the corporation within the State of Connecticut, it could not confer upon the receiver any extra-territorial jurisdiction or operate *proprio vigore* to vest in him the title to any property of the Natchaug Silk Company beyond the limits of the State of Connecticut.  *Bartlett & Robbins* v.

*Wilbur*, 53 Md. 485, 494, citing *Booth* v. *Clark*, 17 How. 322. A claim for it by the plaintiffs of any such efficacy, would be fatal to their right to recover in this action; for if the title to the property sought to be condemned were once vested in the receiver, it could no longer be condemned as belonging to the Silk Company. If the decree had no extra-territorial operation, it could not limit or abridge the exercise of the power of the corporation or of its officers or agents outside of the State of Connecticut, although if any of the latter were citizens of that State, the Court which passed the decree might punish them for contempt in the event of their wilfully acting in violation of its commands. But there is nothing in the record to show that Mr. Chaffee, as president and general manager of the Silk Company, had not already made the sale to Mr. Dooley, of the goods in Linville's custody, before the receiver was appointed, or that he had any knowledge of the receivership proceeding at the time the goods were actually delivered as testified to by Mr. Linville. It must be remembered that the *onus* of proof is upon the plaintiffs to show affirmatively that this transfer to Mr. Dooley, as receiver of the bank, was invalid.

Although about two years have elapsed since the appointment of the receiver, he has not yet, so far as the record discloses, or as the counsel for the garnishee are aware, ever made any claim for the goods in Mr. Linville's custody, or brought Mr. Chaffee before the Connecticut Court to call him to account for his action in transferring these goods to Mr. Dooley. Indeed, had these goods been turned over to the receiver to make distribution among the creditors, the bank, whose claim is about fifteen times as large as that of the plaintiffs, would have been entitled to receive fifteen dollars of the proceeds for every one dollar paid to the plaintiffs.

Assuming then that the Silk Company being still vested with the legal title to the goods, had the right to transfer them to the receiver of the bank in part payment of its indebtedness, the question then comes up as to how far it is bound

by the action of its president and general manager in the premises.  By the terms of the by-law creating the office of general manager adopted by the Silk Company on February 3rd, 1891, it was expressly provided that he should " *have entire charge of the business and affairs of said company* subject to the order and approval of the board of directors."

Now it appears from the evidence, that as a matter of fact, he was supreme in the management of the company in all the branches of its business, and that nobody ever questioned his orders in regard to anything.

It is submitted that the legal effect of the words " subject to the order and approval of the board of directors " in the foregoing by-law is not to make such " order and approval " necessary to the validity of every exercise of power on the part of the general manager—for that would practically reduce his power to a nullity—but that it means simply a reservation to the board of the right to intervene and control his action whenever it may see fit to do so, and that the by-law therefore confers upon him the right to exercise the full power of the board in the management of its business in every particular until such right of intervention should be actually exercised, and consequently to make his acts the acts of the corporation wherever the board did not actually and with reasonable promptitude thus intervene to control them.  (See *Indianapolis Rolling Mill* v. *St. Louis, &c., R. R.,* 120  U. S., p. 256, 259.)

In the case of *Lewis* v. *Hartford Silk Co.,* 56 Conn., 25, PARDEE, J., after stating the powers of a general agent of a company to bind it by its action, says (p. 39) : " As it is the company's duty always to pay its debts, the application of any of its personal property or rights in stock *at any time* to that use by its accredited financial agent without limitation is binding upon it."

And in a case between the same plaintiffs and the same defendant in the U. S. Circuit Court of Appeals for the Second Circuit, arising out of another transfer of goods made

by Mr. Chaffee to Mr. Dooley about the same time, the Court says in relation to Mr. Chaffee's authority to make it (38 U. S. Appeals, 654): " The complainants present questions of law or of fact at each step of the bank's proceedings ; two of them are of a character which cannot be determined upon the affidavits.   The first is that Chaffee, a president and general manager of the Silk Company, which was in fact and must have been known by him to be insolvent, had no authority to sell a large portion of the personal property of the company to one of its creditors in part payment of its debt.   *The decisions of the State of Connecticut apparently recognize that a president and unlimited general manager of its manufacturing corporations is vested with such power and that such a transfer of personal property is valid,* but the complainants assert that by the general commercial law a general manager of a private corporation is not clothed with this power.   The answer to the first question, which, as presented, is one of law, may be controlled by the facts which may subsequently appear as to any limitation of Chaffee's actual power of which the bank had knowledge."   In this case no facts are in evidence which show any limitation of any kind whatever upon Chaffee's actual powers other than the by-law already quoted, and there is nothing to show that the bank ever had knowledge of this.   As to the extent of the powers of general agents, see also *Ham* v. *Drew*, 83 Tex. 77 ; *Ceeder* v. *Loud*, 86 Mich. 541 ; *S. C.*, 24 Am. St. R. 134 ; *Mitchell* v. *Deeds*, 49 Ills. 416 ; *S. C.*, 95 Am. Dec. 641 ; *Phillips* v. *Campbell*, 43 N. Y. 271 ; *Oakes* v. *Cattaranqus Water Co.*, 143 N. Y. 430, 436.

PAGE, J., delivered the opinion of the Court.

In this case an attachment was issued out of the Superior Court of Baltimore City, at the instance of the appellants, against the Natchaug Silk Company, a Connecticut corporation.   It was laid in the hands of Charles H. Linville, garnishee, who has pleaded *non assumpit* on behalf of the defendant, and *nulla bona* as to himself.

At the trial the plaintiffs having first offered other evidence to establish their claim, introduced the garnishee himself, and proved by him that he has been the agent of the Silk Company in Baltimore ; and as such, had in his possession on the 25th of April, 1895, certain of its goods. That up to the 27th of December, 1895, when the attachment was laid in his hands, he still retained the possession of the goods, or the proceeds of the sale thereof; and that he yet holds them, exactly as he had before. On cross-examination, he testified that on the 26th of April, 1895, Mr. Chaffee, the president and general manager of the Silk Company, told witness, that " to recompense or make good a claim which the bank had against the company," the goods in his hands had been transferred to Mr. Dooley (who was the receiver of the bank), and also asked witness if he would " continue to represent the bank or Mr. Dooley in the sale of the goods." This he consented to do ; and thereupon received from Solomon Lucas, then present, as the attorney for Dooley, an authority in writing to so act. Subsequently witness received letters from Dooley about the goods, a copy of one of which, recognizing Linville as his agent, is exhibited in the record. That under this authority, the witness, after the 26th of April, held the goods as agent of Dooley. To the admission of the evidence thus given on cross-examination, the plaintiffs objected on the ground that the conversation between Chaffee and the witness was hearsay, immaterial, and particularly because it was not shown that Lucas had any authority at that time to represent Dooley. As to the last objection, we think it clear that Dooley, by his letter of 12th of July, recognized the authority of Lucas and ratified his act. The witness having testified that on the 25th of April he had in his possession goods of the Silk Company, and that he still held "these same goods," it was entirely proper to interrogate him on cross-examination, how, and for whom he held them, after that date. Such facts were germane to and connected with the main issue, which was, to whom the goods belonged at the time

the attachment was laid in the garnishee's hands. *Griffith v. Diffenderfer*, 50 Md. 479.

There were present on the occasion referred to by witness, the president and general manager of the Silk Company, the representative of the receiver of the bank, and the person who had actual possession of the goods as agent of the Silk Company. The general manager directs the agent that the goods had been transferred, and inquires if he will continue to hold them as agent of the receiver; the agent consents to do so, and receives the authority to so hold them from the attorney of Dooley. Now, if it be assumed that there had already been a contract for the sale of the goods by the proper authority, or if Chaffee had power to transfer them, the effect of all this was to make a delivery of the property to the receiver and to constitute Linville his agent for the custody and sale of the goods. *Thompson, Garn.*, v. *B. & O. R. R. Co.*, 28 Md. 396.

The witness was then asked by the plaintiffs whether there was any written assignment, and replied he "thought there was a bill of sale, but whether on that day or prior thereto he was not sure, and he did not think that he had ever seen that bill of sale." The plaintiffs then further objected to so much of the tesimony of the witness as purported to prove a transfer; on the ground the transfer was made by written instruments. Respecting this, it is sufficient to say that it had not appeared the transfer had been effected by written instruments. The witness only said, "he thought" there was a bill of sale, but had never seen it. Such evidence is hearsay, and not sufficient to support the objection made by the plaintiffs.

From what has been said, it follows we find no error in the rulings of the Court set out in the first and second exceptions.

At the conclusion of the evidence, the Court at the instance of the garnishee, instructed the jury that there was no evidence before them from which they could find that there was in the hands of the garnishee at the time of the

laying of the attachment or since, any of the goods, chattels or credits of the defendant. The propriety of this ruling, is the question presented by the third and only other exception.

It must be borne in mind, that the goods attached, it is conceded, were on the 25th of April, 1895, the property of the Silk Company ; also the fact, that up to and at the time the writ was laid, that is to the 27th December following, the garnishee still retained the possession of them. The only issue therefore between the parties seems to be, did the goods or the proceeds of the sale of them, for any reason, at any time between those dates, cease to be the property of the Silk Company? In presenting this question, many points were raised and exhaustively and ably argued. In our view, however, it will not be necessary for us to consider more than a single phase of the case. At the outset, we may remark, there is no evidence in the record tending to prove the transfer to the bank or its receiver, except that contained in the testimony of the garnishee. There is some evidence that sometime in 1890 and 1894, certain papers called by the witness "bills of sale" were made, but there is no proof whatever that the specific articles mentioned in them included any of the goods that were attached in this case. The first of these so-called bills of sale is dated January 1st, 1890; it is only a bill of goods alleged therein to have been sold by the Silk Company to O. H. Risley, cashier of the First National Bank, with the word "paid" at the end, and signed "Barrows," a bookkeeper of the Silk Company. The two others are like the first, except are appended the words, "the goods represented by this bill are pledged to the National Bank of Willimantic as security for loans made by said bank to the Natchaug Silk Company;" they are signed by J. D. Chaffee, president, and Charles Fenton, treasurer. Of these instruments the treasurer, Fenton, testifies that no record was made of them in the books of the Silk Company or anywhere else; they were never brought up at any meeting of the company;

none of the directors knew of them, " as far as he knew ; "
and none of the goods mentioned in them or either of them,
was ever delivered to the bank or set apart for it, but were
sold from time to time and used in filling orders, "the same
as any other stock." Without pausing to inquire how far
such instruments under all these circumstances could oper-
ate to transfer such a title to goods, either in Connecticut
or Maryland, as to defeat the claims of an attaching creditor
in the latter State, it can be safely stated there is nothing in
them on the face of the papers themselves, or connected
with them by proof, that in any manner affects the goods in
the hands of this garnishee. It must be assumed, therefore,
as we have already said, the whole case turns upon the
effect of Linville's statement ; and if upon the case made
by his evidence, the transfer to the bank or its receiver was
not successfully effected, the title is still in the Silk Com-
pany, and the attachment of the plaintiffs must be main-
tained, although it may appear the receiver of the Silk Com-
pany was appointed before the alleged transfer, it being con-
ceded that the right of a creditor to attach goods in Mary-
land, is not impaired by the previous appointment of a
receiver in the State of Connecticut. Now Linville's tes-
timony is that on the 26th April, Chaffee came to his office
in Baltimore ; that he (Linville) had been the agent in that
city of the Silk Company for five years, and prior to that
time had known Chaffee " only as having been president,
manager and everything else connected with the company."
Chaffee told him, " that to recompense or to make good a
claim which the bank had against the company, these goods
had been transferred to Mr. Dooley, and then belonged to
him, and he asked witness if he would continue to repre-
sent the bank or Mr. Dooley in the sale of the goods."
Linville consented, received from Lucas, the attorney of
Dooley, the authority to so act, and did so act up to the
date of the attachment. This proceeding on the part of
Chaffee was unknown to and without the authority of the
directors of his company, and was never ratified by them.

Dooley, subsequently at a meeting of the directors in the company's office in Willimantic, stated that "Mr. Chaffee had been to New York, Chicago, St. Louis and Baltimore, in an effort to secure the bank of goods of the Natchaug Silk Company, that were held in these offices, and that it was very necessary that the board  *  *  should ratify what had been done." This request was not however acceded to ; " in fact," says a witness, " they refused to ratify what had been done. " It thus appearing that Chaffee's act in making the transfer was without the prior specific authority of his company, and was not subsequently ratified by the board of directors, it remains to inquire whether Chaffee as president, or general manager, *virtute officii* or by usage or otherwise, possessed the power and authority thus to bind the company ? To properly meet this question, a brief statement of other facts in the case is required. The Natchaug Silk Company, organized originally as a joint stock association, was incorporated by the Legislature of Connecticut in 1889. Its business was the manufacturing and dealing in silk, leather, wool, or other substances composed wholly or in part of those materials, and to do such other things as are incident to that business. Chaffee was its president and general manager from the beginning. In the course of its business, it became a large borrower of the First National Bank of Willimantic. The record shows that its indebtedness on this account as far back as 1893, amounted to more than $300,000, and it remained at not less than $285,000. It was enabled to secure this large credit with the bank by reason of the fact that the Silk Company's financial agent, Risley, was also the cashier of the bank. It was this credit only that for several years enabled it to maintain itself as a going concern. In fact it had not been solvent since 1890. Risley died on the 12th of April, 1895, and on the 22nd of the month the bank went into the hands of the receiver ; and by reason of these facts the principal, if not the only source of credit of the Silk Company, was entirely cut off. To Chaffee as well as

to all who knew the situation, it became evident that the
Silk Company's affairs must also pass at no distant period
into the hands of a receiver.   Under these circumstances
Chaffee determined to make an effort to secure the bank by
transferring to it the goods of his company held in the
offices of its agents in New York, Chicago, St. Louis and
Baltimore. Probably it was to make his action more effec-
tive that shortly after Risley's death he forwarded goods of
large value to New York, assigning as a reason therefor
that as he could get no more money from the bank he
would make arrangements elsewhere.  Almost all the debts
of the Silk Company were to become due on the twenty-
second of April or within a few days thereafter.   Chaffee
seems to have kept his purpose strictly to himself.   As he
was about to start on his mission, he told Barrows, the
bookkeeper, " if he needed any counsel in the matter to con-
sult Perkins."   On 22d April he proceeded to New York
and transferred all the company's goods, including those
he had sent there the week before, to the bank, on account
of his company's indebtedness to the latter ; thence he went
to Chicago and Baltimore and at each place made a transfer
of all the goods held there—thus placing all the property
of the company outside the State of Connecticut (so far as
the record discloses) in the hands of the bank.   It is
obvious, such transfers were not made in the usual course
of business, but solely for the purpose of devoting all the
assets within his control (a receiver having been appointed
for the company in Connecticut on the 26th April), to the
discharge of the .antecedent claim of the bank ; thus
constituting, of his own will, the bank a preference credi-
tor of his insolvent company.   The twelfth by-law of
the company provides for the election of a general mana-
ger " who shall have entire charge of the business and
affairs of said company, subject to the order and approval
of the board of directors."   This by-law, by a reasonable
construction, confers full power to do all things and make
all contracts that are needed in transacting the ordinary

business of the corporation within the legitimate scope, objects and purposes of its organization, but not such authority as that he may deal at his own pleasure with the assets, outside the regular course of business.    Nor does it appear from anything contained in the record that Chaffee had ever arrogated to himself such extensive authority.    Prior to the transaction in question, he had never undertaken to dispose of the property of the company otherwise than in the regular course of business.    This case is clearly distinguishable from one where the managing officer has disposed of the property for the purpose of procuring credit for his company ; there are cases where that is held to have been a proper exercise of his authority : *Fay* v. *Noble* 12 Cushing, 1 ; *Lewis* v. *Hartford Silk Co.*, 56 Conn. 36.    But with that question we are not now called upon to deal.    In this case the transfer was for the purpose of securing or paying an antecedent debt.    Chaffee's authority under the by-law, and all the authority he was permitted to exercise in the management of the affairs of the company, was conferred upon him for the purpose of enabling him to properly and successfully conduct the business, to keep the company a going concern with capacity to earn a profit for its stockholders ; not that he might, after the company became insolvent and was about to go into the hands of a receiver, parcel out its assets or any portion of them among such of the creditors as his caprice or interest might lead him to select.    An authority like this has never been accorded as far as we are informed, to any officer charged with the conduct of the affairs of a corporation, whether he be called president, general manager or by any other name, unless there had been conferred upon him a prior express authority by the directors or stockholders of the company.    Ordinarily, it is true, an authority to do a particular act, may be inferred by persons dealing with the corporation from the fact that the officer who is acting for it has habitually assumed and exercised the power in the face of the public. *Olcott* v. *Tioga R. R. Co.*, 40 Barb., 179 ; 4 *Thompson on*

*Corp.*, sec. 4626 ; *Ceeder* v. *Loud & Sons Lumber Co.*, 86 Mich. 541.

But under no theory of implied power can either a president or general manager transfer the assets of an insolvent corporation about to go into the hands of a receiver for an antecedent debt. The case of *Hoyt* v. *Thompson*, 5 N. Y. 320, is instructive on this point. There the Morris Canal and Banking Company, an insolvent corporation of New Jersey, being indebted to the State of Michigan, its president and cashier, without the authority of the directors, to secure the payment of the Canal Company's debt, assigned to the State of Michigan a debt and mortgage due to the Canal Company by a Railroad Company. There was no proof that the State had any knowledge that the assignments were made without the authority of the directors, and such want of proof, if there were nothing else in the case, might propably authorize a presumption they were executed in pursuance of the authority of the directors, and that the president and cashier of the Canal Company were acting within the general scope of their powers ; but that principle could not apply in that case, for, said PAIGE, J., " If the assignments had been made to the State of Michigan for a new consideration paid at the time, or if the State had relinquished any security held by it, so as to entitle it to the character of a *bona fide* purchaser for a valuable consideration, and the agents * * of the State * * had no notice of the want of authority of the officers of the Canal Company making the assignment * * the company would be estopped from denying that the president and cashier had competent authority to execute and deliver the assignments * * But inasmuch as the State of Michigan received the assignments as collateral security, merely for an antecedent debt, the Morris Canal and Banking Company or its representatives are not estopped from denying the authority of its president and cashier to execute and deliver the assignments."

It has always been held, that unless there is prior express authority, or subsequent ratification or unless some principle

of estoppel intervene, the president or managing agent has only the authority to bind the company while acting within the scope of his duties and in the ordinary routine of business. 4 *Thompson on Corp.*, sec. 4849, *et seq.* and authorities there cited. This is a general principle for which many cases could be cited. It has been often applied, as for instance where managing officers have undertaken to consent to the appointment of a receiver (*Walters* v. *Anglo Am. Mortgage Co.*, 50 Fed. Rep. 316); or to release claims, *Bank of U. S.* v. *Dunn*, 6 Peters (U. S.), 60 ; or alien property, *Luse* v. *Isthmus Transit R. Co.*, 6 Or, 125 ; *Bliss* v. *Kaweah Canal, &c.*, 4 Pac. Rep. 507 ; *Walworth County Bank* v. *Farmers' L. & T. Co.*, 14 Wis. 325 ; *Hyde* v. *Larkin*, 35 Mo. App. 365 ; *Bank* v. *Lumber Co.*, 116 N. C. 828 ; *England* v. *Dearborn*, 141 Mass. 590.

There is nothing in conflict with what we have said, in *Hadden* v. *Natchaug Silk Co.*, 74 Fed. R. 429. In that case JUDGE SHIPMAN said : "The decisions of the State of Connecticut apparently recognize that a president and unlimited general manager of one of its manufacturing corporations is vested with such power" (that is to sell the property of the corporation in part payment of its debts) "and that such transfer is valid ; " but adds that this being a question of law, "may be controlled by the facts which may subsequently appear as to any limitation of Chaffee's actual powers of which the bank had knowledge." The Court did not decide as to the power of Chaffee ; as to that the question was of a character which cannot be determined on affidavits. Nor does he decide what the power of a general manager is in Connecticut, but only what it "apparently is " and that it is subject to modification by other facts than those before him in that case.

We are of opinion, for these reasons, that Chaffee had no power under these circumstances disclosed by the evidence contained in the record, to make an effective transfer of the goods, and that the plaintiffs were entitled to maintain their attachment.

Finding error in the granting of the defendant's prayer, the judgment must be reversed.

*Judgment reversed with costs and cause remanded for new trial.*

(Decided June 23rd, 1897).

A motion for a re-argument was made and in disposing of the same,

PAGE, J., delivered the opinion of the Court.

The motion for a re-argument must be overruled. It is not desired because of error supposed to exist in the opinion already filed, but because it is contended this Court should have held that the Court below was without jurisdiction, because it is alleged the proceedings show upon their face that the requirements of the statute have not been substantially complied with, in that the affidavit appears to have been made several months prior to the time of the suing out the attachment. The counsel for the appellee insist that the statute clearly implies that the affidavit must be made, either at the time of the institution of the suit, or as shortly before as conveniently may be. But while we are of opinion that this is a very proper practice, and that there may be such delay between the making of the affidavit and the suing out of the writ as may reasonably induce a presumption, when taken in connection with other facts properly proven, that the process of the Court is being abused or that the facts set forth in the affidavit may not be true when the suit is instituted, yet we do not think such divergence of dates is a jurisdictional matter that will enable this Court on appeal to consider the question in a case like the one at bar, where the point was not raised and considered below, on appropriate motion or plea. It is only when the want of a substantial compliance with the requirements of the statute appears on the face of the proceedings, that an objection to the jurisdiction can be relied on appeal, where such objection has not been made below. *Coward* v. *Dillinger*, 56 Md. 62.

Now we think it cannot properly be held that our statute requires the affidavit shall be at or near the time of the institution of the suit.   By the 4th section of Art. 9, Code, it is provided, " no attachment shall issue unless there be an affidavit, &c.;" and by the 5th section, such affidavit may be made in the State, in the United States or in any foreign country.   The words of the 8th section " upon making the affidavit and producing the proofs, &c."—cannot be construed therefore as implying, that the affidavit shall only be made where the suit is instituted, because it may, by the fifth section, be lawfully made in a country so remote as to make it impossible to have it within the State for days or even weeks after it was made.   Nor does the statute direct that it shall be made within a reasonable time. If this construction of the statute be insisted on, it may be asked by what facts and circumstances is the reasonableness of the time to be determined ?   Is it to depend on distance, facility of intercommunication, diligence, or the vicissitudes of the weather?  In *Wilson* v. *Arnold*, 5 Michigan, 104, the Court very properly remarks :  "We fear if we had power to give such a construction to the statute and should so construe it, more evil than good would be done by it.  The uncertainty it would throw over the title of real estate taken on attachments, would more than counterbalance its advantages.   A jurisdictional question above all others, should not be left in so much uncertainty."  *McClanahan* v. *Break*, 46 Miss. 258.

In this case there were three exceptions.  Two of them to the admission of testimony and one to the granting of an instruction.  There was no question raised below, as to whether the delay between the making of the affidavit and the bringing of the suit worked an injury to the defendant or garnishee, or whether the process of the Court was being abused, or whether the facts set out in the affidavit were untrue when the proceedings began.   This could have been done by proper motion or plea, and it may be, if that course had been pursued, the delay might have been an important

matter in connection with such other facts as it would have been within the power of the defendant to prove.

(Decided November 18th, 1897).