## BUCHWALD TRANSFER COMPANY *vs.* JOHN J. HURST.

*Corporations—Authority of President to Execute Chattel Mortgage.*

The president of a corporation is not as such authorized to execute a mortgage of its property unless authorized so to do by the directors. But that authority may in some cases be implied when the entire management of the business has been confided to the president, and the directors have acquiesced in the prior performance by him of similar acts.

The president of a business corporation owned nearly all of its capital stock, exercised complete control over its affairs, borrowed money for it and loaned money to it. No meetings of the board of directors had been held from the time of the organization until after the president and secretary had executed a chattel mortgage of the company's property to secure a loan, when the board passed a resolution disapproving of the same. The directors were the only shareholders, had full knowledge of the manner in which the president managed the concern, and had acquiesced therein. The mortgagee had no reason to suspect that the money was not borrowed for the use of the corporation. *Held,* that this mortgage is valid and enforceable not only against that company, but also against another corporation which had purchased the property of the former with knowledge of the existence of the mortgage.

*Decided December 1st, 1909.*

Appeal from the Circuit Court No. 2 of Baltimore City (SHARP, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and THOMAS, JJ.

*William H. Hudgins* (with whom were *George R. Willis* and *Jas. McEvoy, Jr.,* on the brief), for the appellant.

*Addison E. Mullikin,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a petition filed by the appellant against the appellee and dissolving an injunction which had been granted as prayed for in the petition. A chattel mortgage had been given to the appellee which was executed in the name of the Buchwald Transfer Company by William J. Keyes, its President, for the sum of $1,580.00. The appellee was proceeding to foreclose the mortgage when the above mentioned petition was filed, alleging that it was given by the President without authority, and for his own benefit and not that of the company. The mortgage is not in the record, but we understand it to be conceded that it purports on its face to have been regularly executed by the company, signed by its President, attested by its secretary and having the seal of the company affixed.

That company became involved and some of the creditors organized the appellant—the Buchwald Delivery and Express Company of Baltimore City. The other general creditors were settled with, and the new company purchased all of the property of the old one. In the petition it is alleged: "That your petitioner, in purchasing the property, while being advised of the alleged chattel mortgage held by the said John J. Hurst upon the property of the Buchwald Transfer Company, was advised that said chattel mortgage had been made, executed and delivered to the said John J. Hurst by William J. Keyes, the President of said defendant, in order to secure

mónies to enable the said Keyes to pay personal obligations and debts of his, and that no moneys in consideration of said chattel mortgage ever passed to the Buchwald Transfer Company or to William J. Keyes, as President thereof." It is also alleged that the check which the appellee gave Keyes was payable to him individually, and not to him as President, and that the appellee "knew or should have known that said $1,580 were not to be payable to the Buchwald Transfer Company." The check itself was, however, produced and is payable "to the order of Wm. J. Keyes, President."

By the admission in the petition, it is therefore shown that the new company purchased the property with knowledge that there was on record what appeared on its face to be a valid chattel mortgage, regularly executed by the company. It is true that the stockholders of the appellant were creditors of the old company, but the relief sought is in the name of the appellant, and not the stockholders as creditors of the old company, and hence the fact that it purchased the property with full knowledge of the existence of the mortgage is a material one.

The defendant answered the petition under oath, and denied the material allegations in it with reference to his knowledge that the money was to be used by Keyes personally, etc. The answer alleges that the company was organized by Keyes as a business expediency and that he owned about ninety per cent. of the stock, that it was dominated and controlled by him, that he continued after the organization of the company to exercise all the powers and control over its business affairs that had been exercised by him prior to the incorporation, when he was sole proprietor of the business, that Keyes bought all the horses, wagons and other property useful to the defendant and sold the same or so much thereof as was by him deemed advisable, when and as he thought proper, that he borrowed money for the corporation and pledged its credit therefor whenever he considered the same to be to the best interest thereof, signed all checks and notes, that the sign in front of the building occupied by the company reads "Buch-

wald Transfer Company, William J. Keyes, Proprietor," and
the company is so listed in the city directory and in the tele-
phone directories, that the directors were at all times well
aware of said dealings by William J. Keyes, as President,
and acquiesced in the same and that the directors and stock-
holders are identical.

A general replication was filed and evidence taken. It is
shown that the directors never authorized the mortgage—in-
deed there was not a meeting of the directors from the day
of the organization of the company until May 9, 1908, when
they passed a resolution that the action of the President "in
placing a chattel mortgage of $1,580 on the equipment of
this company be disapproved." The mortgage was dated
April 21, 1908. The transfer business was originally con-
ducted by William J. Keyes. The company was organized
with an authorized capital of $17,000 and Mr. Keyes trans-
ferred his business and the equipment owned by him for
$16,900, for which he took stock of the company. He was
entitled to 169 shares of stock, of which he sold five to Mr.
Bennett, ten to William F. Keyes, and gave two to Mr. Raf-
ferty.

Mr. Keyes testified that there was no cash capital invested
at the time of the organization of the company, and in answer
to the question: "State what difference, if any, there was be-
tween the manner in which you managed the company before
and after its incorporation," replied: "There was very little
difference. I was in entire control and did control and man-
age everything, such as buying and selling horses, ordering
new wagons if necessary, ordering repairs, purchasing the
horses, etc. There was virtually no difference in the manage-
ment of the business. I had entire control the same after-
ward as I had before. I borrowed money when it was nec-
essary, transacted the business of the concern and was looked
to to furnish all funds for the concern." Mr. Rafferty said
there was no actual cash transferred to the company when it
was incorporated and he was asked this question, "Then after
its incorporation in March, 1907, the company never received

any cash from any one except Mr. Wm. J. Keyes and parties from whom the company borrowed money through him," to which he answered, "That is right." He also said that William F. Keyes, Mr. Bennett and himself, who were directors, knew that William J. Keyes was overdrawing his account and also his method of dealing. There can be no question therefore that William J. Keyes exercised entire control over the affairs of the company, with the knowledge of the other members of the board, who, together with him, constituted the stockholders. It is true that he had hypothecated a good portion of his stock, but there is nothing to show that the parties with whom it was so hypothecated ever had anything to do with the management or the affairs of the company. It is also proper to mention the fact that Mr. Rafferty said that when he signed his name to the mortgage as secretary he did not know what it was, but he had signed at least one other mortgage, which had been previously given in the same way to Mr. Marchant.

Now with these facts established the important question is, whether the mortgage given to the appellee must be declared invalid merely because the directors had not formally authorized its execution, for that is what the testimony reduces the inquiry to. Under the circumstances, it cannot be said that the Buchwald Transfer Company could have successfully attacked the validity of the mortgage without showing more than this record discloses. It is true that a president of a corporation does not ordinarily have authority to mortgage its property, unless authorized by the Board of Directors, but that authority may be implied under some circumstances. This was a business corporation which, according to the evidence, was absolutely controlled by the President, who not only had the general management, but from the time of the organization of the company borrowed money whenever it was necessary, and furnished it all the funds which it had outside of the receipts from its regular business.

The directors held no meetings after the one at the date of the organization of the company until after the mortgage was

given, although the by-laws provided for monthly meetings as well as special ones and they were fully aware of the president's method of conducting the business. Directors may make themselves liable for such neglect, but Courts should not be too ready to relieve corporations from the results of such neglect under such circumstances as we have in this case, as innocent persons are likely to be made to suffer, if corporations can permit officers to exercise such control over their affairs as an individual does over his own, and then, if disaster comes, escape from liability by denying the authority of the officers to do the very thing they had been permitting them to do, or such things as would lead the public to believe they had the right to do.

In *Susquehanna Bridge and Bank Co.* v. *General Ins. Co.*, 3 Md. 305, it was urged among other defenses that Freeman, who professed to be the president, and who had executed a mortgage, was not proven to be the president, and LE-GRAND, C. J., said: "If he were not in point of fact the president, the corporation owed it to the community to give notice of the fact. To allow a person publicly to proclaim himself authorized to act in a certain capacity, and to seek to avoid his acts when such avoidance would work to the advantage of the corporation, would be but to authorize the perpetration of frauds on an unsuspecting community." So to allow a president, who has such unusual control over the company, to borrow money as he thinks proper, and then rely as a defense on the fact that the directors had not specially authorized the particular transaction might be characterized in the same way. In that case another defense was that the corporation had no power to mortgage its property, but the Court, after referring to a provision in its charter which authorized it, said: "But, independently of this, we are of the opinion it would have been competent to the corporation to have secured, by mortgage, a debt due by it; such power is necessarily incident to the power to borrow, and its exercise could only be restrained by express inhibition in the act of incorporation." Or as stated in *Booth* v. *Robinson,* 55 Md. 419, "the

power to borrow carriers with it very generally, unless expressly restrained, the power to secure the loan by mortgage."

We are aware that those cases refer to the powers of the corporations themselves, and not distinctly to the powers of an officer or agent who, it is claimed, is not authorized by the corporation to do what it might have done through the Board of Directors. But they reflect upon the question here involved, because it could scarcely be denied by the appellant that Keyes did have at least implied authority to borrow money for the corporation, and he had so universally done so when it needed money that the corporation would be estopped to deny such authority. As is said in sec. 68 of Mr. France's excellent book on *Elements of Corporation Laws,* in discussing the authority of officers and agents, "their powers strictly depend upon the authority the principal has given them *or has held them out as possessing.* * * * And whatever any officer or agent of the corporation, high or low, has been authorized to do; and whatever he has, with the knowledge of the board, been in the habit of doing,—in such and similar matters, the corporation will be bound." And again it was there said: "But while, presumptively, the president is nothing more than the presiding officer of the board and his further powers are derivative—nevertheless the authority to do a particular act may always be inferred from the acquiescence of the board in his prior performance of similar acts. And in the case of business corporations the Courts are not slow to draw the inference."

It was said in *Cunningham* v. *German Ins. Bank,* 101 Fed. 977, that, "When the shareholders of a corporation by their direct act or acquiescence invest the executive officers of the company with the powers and functions of the Board of Directors, as a continuous and permanent arrangement, the board being entirely inactive, and the officers discharging all its duties, a mortgage on the property of the company made and executed in its behalf by such officers is valid, although not authorized by a vote of the stockholders or directors." In this case the shareholders and directors were the same

persons, and we have seen how completely they invested the president with the powers and functions of the board. In *Thompson on Corporations,* par. 8560, that learned author says: "Authority conferred upon the president of the corporation to borrow money carries with it authority to pledge personal property to secure any money so borrowed." In 10 *Cyc.* 904, in enumerating powers which have been implied in a president, acting in the usual course of the business his corporation is engaged in, among others mentioned is "when intrusted with the entire management of the corporate business, to execute a bill of sale to secure the corporation's debts." And on page 910 of the same volume it is said: "If a corporation commits the entire management of its affairs to its president and secretary and holds no meeting of its directors, except when the president sees fit to call them together, a conveyance of land made by the president and secretary without official authority from the board will be deemed valid, in favor of a bank which has made large advances upon notes secured by a vendors' lien given to the president and secretary for the purchase money and transferred to the bank."

One of the principal cases relied on by the appellant is *England* v. *Dearborn,* 141 Mass. 590. England was the owner of most of the stock of the corporation, but the Court held that to be immaterial. The opinion states that it did not appear that England had ever executed any other mortgages of the corporation, and there was no evidence of authority having been given him, or of any ratification of or acquiescence in the mortgage, and the corporation received and retained no property or advantage from the mortgage. It was given by England to his father as an indemnity against a pre-existing liability as endorser of a promissory note. The part of the opinion quoted in the brief of the appellant concludes: "If, on the evidence in this case, this mortgage can be held valid, it must be on the ground that *prima facie* the person who is the president, treasurer and general manager of every corporation, or every manufacturing corporation, has author-

ity to mortgage all its personal chattels for a debt of the corporation. No cases have gone as far as this." But there immediately follows in the opinion this statement: "Authority to make a mortgage need not be given by a formal vote, and may be inferred from the manner in which the business is conducted, with the knowledge and acquiescence of the corporation or its officers, *Sherman* v. *Fitch*, 98 Mass. 59; but there is nothing in this case from which previous authority or subsequent ratification can be inferred, except the fact that William H. England was made president, treasurer and general manager of the corporation. Authority to sell or mortgage all the property of a corporation except its book accounts, cannot be one of the ordinary methods of carrying on the business of a manufacturing corporation." In 5 *Thompson on Corporations,* par. 6179, the author concedes the law to be that a general agent has no power to mortgage all the personal property of a corporation, except book accounts, to secure a pre-existing debt, without a previous authority communicated in some form, expressly or tacitly, and adds: "But on the other hand where such a corporation loosely commits all its business affairs to a superintendent, and he executes a chattel mortgage to secure a depositor who threatens to withdraw his deposit, the mortgage will be sustained so to allow the depositor a *preference* on final distribution after insolvency." He cites *England* v. *Dearborn, supra,* to sustain the first statement, and *Poole* v. *West Point Assoc.,* 30 Fed. Rep. 513, for the latter. The general principle is recognized in *Hadden* v. *Linville,* 86 Md. 210, and *Carrington* v. *Turner,* 101 Md. 437.

We do not question the wisdom of the rule announced in *England* v. *Dearborn,* but the facts in that case differ very materially from those now before us. It is true that the evidence shows that Keyes had only executed one mortgage before the one in controversy, but, as we have seen, he had had entire control over the affairs of the company since its organization, with knowledge of the directors, and undoubtedly had the implied power to borrow money for it, as he constantly

did. We think, under all the circumstances, he had the implied power to give a mortgage on the company's personal property to secure the amount borrowed from the appellee, and as the secretary united in the mortgage and the corporate seal was affixed the appellee had the right to assume that the mortgage was executed by the authority of the corporation, it not being shown that he had reason to suspect the money borrowed was not for the benefit of the company.

The evidence is not altogether satisfactory as to what was done with all the money receivevd from the appellee, but Keyes said he paid Mr. Knight for services he had rendered the company and Mr. Marchant the amount which was due him. He said he thought it was somewhere in the neighborhood of $1,200. The difficulty is that Keyes had such absolute control over the company's affairs that in his testimony he sometimes spoke of the company's indebtedness as if it was his own, and *vice versa.* But he said that the debt due Mr. Knight was for services rendered in incorporating the company and other matters connected with it, and that he had borrowed money from Mr. Marchant which was used for the purposes of the company. The only fair conclusion to be drawn from his testimony is that he paid at least $1,200 of the indebtedness of the company out of the money he received from the appellee, and during the month of April, 1908, being the month the mortgage was given, he paid to the company some cash. But independent of those facts there is nothing to show that the appellee knew or had any reason to suspect that the money was not being borrowed for the benefit of the company.

The allegations of the petition are not sustained in several material respects. In the first place it is not shown that the money received from the appellee was used for the individual purposes of Keyes, and then the charge that the check was payable to Keyes individually, and not to him as president, is shown by the check itself to be incorrect, as well as the allegation that there was an individual indebtedness of Keyes to the father of Rogers O. Knight of $750.00. The only possi-

ble ground for relief relied on in the petition that is not met by the appellee is the fact that the directors did' not formally authorize the execution of the mortgage, which under the peculiar circumstances of this case, as we have already said, is not sufficient to authorize us to declare the mortgage invalid.

As the appellant purchased the property with full knowledge of the mortgage, it has no equity which could be more availing than it would have been to the old company, and we are of the opinion that that company would not have been entitled to have the mortgage set aside. The appellant did not make such inquiries about real facts as might have been made. Whether or not the creditors of the old company would have had a better standing, if they had sued as such, we need not now consider, but it is evident that the appellee would not be in as good a position if the mortgage was now set aside as he would have been if it had been set aside at the instance of the creditors, for there can be no doubt he would have been entitled to have participated in the distribution of the company's assets as a general creditor, even if his lien had been declared invalid, as there can be no possible question, under the evidence, about the power of Keyes to contract the debt. So without discussing other questions, or dwelling further on the want of equity in the appellant which stands in the place of the old company in this proceeding, we will affirm the decree.

> *Decree affirmed, the appellant to pay the costs above and below.*