# STAPLES v. PORT GRAHAM COAL COMPANY.

APPEAL AND ERROR; ESTOPPEL; NEGOTIABLE INSTRUMENTS; CORPORATIONS; PRINCIPAL AND AGENT; BANKS AND BANKING.

1. Where one of the parties disclaimed at the trial below any intention of attacking the good faith of the other party, claiming that the question of good faith was immaterial to the issue, he is estopped on an appeal to claim that such other party acted in bad faith and conspired with others to deprive him of his property.

2. Where a bank, as a condition of cashing for the general manager of a corporation a treasury warrant payable to the corporation, and indorsed by its general manager under a power of attorney by the vice president to indorse and collect it, requires a third person to indorse the warrant, the latter, under sec. 1333, D. C. Code (31 Stat. at L. 1399, chap. 854) becomes an accommodation indorser, and is subrogated to the rights of the bank if the bank on demand of the maker redeems the warrant, and he on demand of the bank makes good to it the amount; and it is immaterial that the general manager on cashing the warrant deposits with the bank a portion of the proceeds to his individual credit.

3. It would seem that the general manager of a corporation, who is its active business head, and who, with his wife, the vice president, and the president, controls all of the capital stock, has implied authority to indorse and cash a negotiable instrument payable to the corporation, which is received by him at a place distant from the home of the corporation, and as a result of the assertion by him there, in behalf of the corporation of a claim, where, with the knowledge and acquiescence of all concerned, he went to such place unprovided with corporate funds to pay his expenses, for the purpose of collecting the claim.

4. A power of attorney by the vice president of a corporation, to its general manager and active business head, given after the death of the president, and before his successor had been elected, to indorse, collect, receive, and receipt for a treasury warrant payable to the corporation, and to take all lawful ways and means for its collection, is binding on the corporation, where the president and vice president have authority by the by-laws to sign bonds, deeds, and contracts, although the vice president is the wife of the general manager, and although a particular bank at the home of the corporation has

been made the depository of the corporate funds, and the president is required to sign checks drawn on such funds, and the treasurer is required to indorse for deposit and collection all negotiable instruments payable to the corporation, where the warrant was delivered to the general manager in this District as a result of the assertion by him here, in behalf of the corporation, of a claim against the government, and he had come here from the distant home of the corporation to collect the claim with the knowledge and acquiescence of all interested in the corporation, without corporate funds to pay his expenses, and where the treasurer, although such in name, performed no duties as such; and it is not the duty of a bank here which cashes the check for the general manager, in his execution of such power of attorney, to supervise the disposition by him of the proceeds.

No. 2994.   Submitted February 7, 1917.   Decided June 11, 1917.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia directing receivers to pay to the plaintiff the proceeds of a treasury warrant.

*Reversed.*

The COURT in the opinion stated the facts as follows:

This appeal by Orren G. Staples is from a decree in the supreme court of the District, and involves the question whether the appellee, the Port Graham Coal Company, is entitled to the proceeds of a government warrant for $5,000 drawn to its order and indorsed and cashed by its general manager, W. G. Whorf, acting under a power of attorney from the vice president and acting president of the company, the president having died and his successor not having been elected.

William G. Whorf and Lenore C. Whorf, his wife, of Seattle, Washington, were the owners of "the Port Graham Mine," so-called, located in the Cook Inlet Mining District of the Territory of Alaska, and, in the early part of 1913, in consideration of $59,700, conveyed it to "the Port Graham Coal Company," a corporation formed for the purpose of operating and developing said mine. Thereupon, in liquidation of said sum, there were issued to Mr. Whorf 299 shares, and to Mrs. Whorf 298 shares,

of the capital stock of the corporation, of the par value of $100, leaving 3 shares of the total 600 shares to be issued to officers of the corporation.

The by-laws of the corporation provided for a president, a vice president, a general manager, a secretary, and an assistant secretary, a treasurer, and such other officers as the board of trustees might appoint. The president was to be the chief executive officer of the corporation, and the vice president was empowered to perform the duties and "have all the powers of the president," except when the president actually was present exercising his right to preside. The general manager was to "have the general charge of the company's business under the supervision of the president and direction of the board of trustees." The treasurer was to exercise, under the supervision of the board of trustees, all the powers and duties commonly incident to his office, and was empowered to indorse for deposit and collection all notes, etc., payable to the corporation. He also was required to sign all checks, drafts, notes, and other obligations for the payment of money, except as the board of trustees should otherwise order.

At the first meeting of the board of trustees, on March 3, 1913, Mr. Whorf was elected president and general manager, Mrs. Whorf vice president, and A. Stern secretary and treasurer. On the next day, at an adjourned meeting of the board, upon the resignation and suggestion of Whorf, a Mr. Redelsheimer, who meanwhile had become a substantial stockholder in the company, was elected president. On the day following, at a special meeting of the board, the First National Bank of Seattle was made the depository of the funds of the company, and it was voted "that the president alone sign all checks drawn on said bank against said funds." There is no evidence that another meeting of the board was held during the next year and a half.

The bookkeeping for the company was done by Redelsheimer & Company's bookkeeper (Redelsheimer's firm), who made out the checks for the company, "and Mr. Redelsheimer signed them." Mr. Stern "acted as treasurer of the company, never bought any stock, never received anything out of it, but acted

simply as treasurer because Redelsheimer wanted him to." No
money ever came into his hands, and he kept no books as treas-
urer. He did not know, of his own knowledge, whether the com-
pany ever had any money in its treasury. He never signed a
check for the company and received no salary. In short, he
was a mere figurehead.

Mr. Whorf, as general manager of the company, received $200
per month as salary, and appears to have been the active head
of the company. On October 31, 1913, Dr. Holmes, director
of the Bureau of Mines in the Department of the Interior, en-
tered into an agreement with the company at Seattle, Washing-
ton, and through Mr. Whorf, for the lease of the company's
scow, which then was at Seldovia, Alaska, the Department to
pay $250 for the month of November and to be responsible
for the safe return of the scow. Thereupon Mr. Whorf wrote
an order for the delivery of the scow, the order was duly recog-
nized, and the Department put into possession of the scow.
Within a few days the scow was lost.

After the loss of the scow Mr. Whorf was sent by the company
to this city to obtain, if possible, an appropriation in the amount
of its value, but he was provided with no funds for his expenses.
After being here two or three months his efforts were crowned
with success, and on April 16, 1914, an appropriation of $5,000
was made "for payment to the Port Graham Coal Company,
Seldovia, Alaska, for a scow rented from that company and
lost by the Navy Alaskan Coal Expedition." (38 Stat. at L.
519, chap. 191.) A treasury warrant for that amount, payable
to the company, was delivered to Mr. Whorf. Prior to that a
check for $25 for the use of the scow and payable to the com-
pany had been delivered to and cashed for Whorf by the Treas-
ury Department without any other authority than his signature
as general manager. He was informed, however, that it would
be necessary for him to have a power of attorney in order to
cash the $5,000 warrant. Thereupon, in company with ap-
pellant, he went to the Commercial National Bank, in which
appellant was a director, and consulted its vice president and
cashier, with a view to having the warrant cashed by the bank.

The cashier referred Mr. Whorf to Mr. Ramsey, who had charge of the investigation of such matters, and who called at the Treasury Department and there learned that Mr. Whorf had given his receipt for the warrant and that it would be necessary to obtain a power of attorney. Mr. Ramsey made further investigation as to Mr. Whorf's identity by interviewing the secretary of the Senator who was instrumental in having the appropriation made, and also interviewed Dr. Holmes of the Interior Department. The result of this investigation was reported by Mr. Ramsey to the bank, and a telegram was written for Mr. Whorf to send to the vice president of the company as, meanwhile, on February 6, 1914, Mr. Redelsheimer, the president, had died.

In a few days after the above telegram had been sent, a power of attorney, duly executed by Mrs. Whorf as "stockholder, trustee, vice president, and acting president of the Fort Graham Coal Company," was received. This document recites the death of the president of the corporation; that Mrs. Whorf, as a stockholder and one of the trustees of said corporation and now occupying the office of and acting as the President thereof, constitutes and appoints William G. Whorf "as my true and lawful attorney for me and in my name, place, and stead, and for my use and benefit, both in my said individual capacity as a stockholder, trustee, and vice president acting as president of said corporation for the reasons above stated, and in all or any of said capacities, to ask, demand, sue for, recover, indorse, collect, receive, and receipt for Naval Warrant No. 5646, dated April 5, 1914, for the sum of $5,000 * * * ; and to have, use, and take all lawful ways and means in my name as above stated, or otherwise, for the collection of said warrant, and to make, sign, seal, and deliver all necessary receipts, acquittances, or other sufficient discharges for the same, and to that end I authorize my said attorney to sign my name in my individual capacity and in any or all of the capacities hereinbefore mentioned, hereby authorizing my said attorney to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes as

I could or might do either in my individual or official capacities above-mentioned, or any of them, hereby fully and irrevocably ratifying and confirming all that my said attorney should lawfully do or cause to be done by virtue of these presents."

Thereupon Whorf made the following indorsement on the warrant: "Port Graham Coal Company. Lenore C. Whorf, Vice President. William G. Whorf, General Manager." Appellant then inquired of the cashier of the Commercial Bank how he, the cashier, regarded the matter. The cashier responded that he "thought it looked regular," but, inasmuch as he was very careful about government checks for large amounts, "for the reason that in case they should come back with any infirmity of any kind" he would *"have someone to go to to take them up,"* he required appellant to indorse the warrant before cashing it. Whorf immediately opened an account at the bank under date of April 14, 1914, and the $5,000 was placed to his credit. He drew out $1,500 that day and the balance in different amounts thereafter, the last check having been drawn August 10th, following.

A meeting of the appellee company was held August 24, 1914, Mr. and Mrs. Whorf being represented by an attorney, who stated that Mr. Whorf had received the $5,000 "and would account therefor except for the fact that Mr. Whorf believed there were other moneys which had not been accounted for." Thereupon the Secretary was requested to "require William G. Whorf to account for all his doings and all moneys received and expended by him as general manager or otherwise since the organization of the company," and the Secretary embodied these directions in a letter to Whorf. Thereafter, in accordance with a resolution passed at a meeting of the corporation, a power of attorney, signed by the then president and vice president of the company, authorized one of appellee's attorneys "to obtain said warrant, to indorse said warrant, and to obtain the money due thereon," etc. No further attempt appears to have been made to recover anything from Whorf, although it does not appear that such an attempt would have been abortive. After a demand upon the Treasury Department, the present bill was filed chal-

lenging the authority of Whorf to indorse and receive payment on the warrant. When this controversy arose the Treasury Department, which had cashed the warrant for the bank, required the bank to redeem it, and the bank, in turn, called upon appellant to make good the amount, which he did. Thereupon, by consent of the attorneys for the respective parties, a decree was entered appointing a receiver to hold the $5,000 pending further order of the court.

*Mr. Bynum E. Hinton,* for the appellant, in his brief cited:

*Andrews* v. *Northwestern Nat. Bank,* 107 Minn. 196, 25 L.R.A.(N.S.) 996, and note; *Bennet* v. *Guiding Star,* 53 Fed. 941; *Bank of Orland* v. *Fennell,* 133 Cal. 477; *Macon* v. *Kent,* 57 Ga. 303; *Coleman* v. *West Virginia Oil Co.* 25 W. Va. 172; *Commercial Bank* v. *Norton,* 1 Hill, 505; *Converse* v. *Meyer,* 14 Neb. 192; *Fulton Bank* v. *Canal Co.* 4 Paige, 135; *First Nat. Bank* v. *Valley State Bank,* 60 Kan. 621; *M. Groh's Son* v. *Groh,* 80 N. Y. Supp. 442; *Hill* v. *Sturgeon,* 28 Mo. 329; *Karns* v. *State Bank,* 101 Pac. 565; *Lingerfelter* v. *Phœnix,* 19 Mo. App. 265; *Lanahan* v. *Lawton,* 50 N. J. Eq. 283; *Marine Bank* v. *Butler Collier Co.* 23 N. Y. S. R. 319, 5 N. Y. Supp. 291; *Pond* v. *National Mortg. Co.* 6 Kan. App. 718, 50 Pac. 974; *Renwick* v. *Bancroft,* 56 Iowa, 527; *Smith* v. *Smith,* 62 Ill. 493, 495; *Sheridan Electric Light Co.* v. *Chatham Nat. Bank,* 52 Hun, 580, affirmed in 127 N. Y. 517; *Southwark Ins. Co.* v. *Knight,* 6 Whart. 327; *Thomas* v. *Miller,* 151 Pa. 482.

*Mr. Samuel E. Herrick, Mr. Joseph W. Cox,* and *Mr. Rufus S. Day,* for the appellee, in their brief cited:

Am. & Eng. Enc. Law; *Bocock* v. *Allegheny Coal & I. Co.* 82 Va. 919; *Capital City Brick Co.* v. *Jackson,* 2 Ga. App. 177; *City Bank* v. *Kent,* 57 Ga. 283; *Colman* v. *West Virginia Oil Co.* 25 W. Va. 148; Cook, Corp. Sec. 712; Field, Corp. Sec. 150; *Fulton Bank* v. *Canal Co.* 4 Paige, 126; *Kenyon Co.*

v. *National Deposit Bank* (Ky.) 31 L.R.A.(N.S.) 169; *Lamson* v. *Beard*, 45 L.R.A. 822; *Louisville & C. R. Co.* v. *McVey*, 98 Ind. 391; *Marine Bank* v. *Butler Collier Co.* 23 N. Y. S. R. 319; *Pearson* v. *Tower*, 55 N. H. 215; *Sheridan Electric Light Co.* v. *Chatham Nat. Bank*, 127 N. Y. 5; *Rochester & Co. Road Co.* v. *Paviour*, 164 N. Y. 281; *Relfe* v. *Rundle*, 103 U. S. 222, 226; *Sheridan Elec. Light Co.* v. *Chatham Nat. Bank*, 52 Hun, 575; *Smith* v. *Smith*, 62 Ill. 493; *Ward* v. *City Trust Co.* 129 N. Y. 61; *West St. Louis Sav. Bank* v. *Parmalee*, 95 U. S. 557.

Mr. Justice Robb delivered the opinion of the Court:

The appellee, both in the brief and in oral argument, suggests "a conspiracy on the part of Whorf, Staples, and the Commercial National Bank to deprive the Port Graham Coal Company of its property." In other words, appellee now attempts to challenge the good faith of appellant and the bank. At the trial, counsel for appellee objecting to a question asked a witness for appellant, appellant's counsel stated: "If your Honor please, I was merely offering that to show the good faith of Mr. Staples, * * * " To this the court answered: "There is not any issue as to Mr. Staples's good faith raised here, is there?" Thereupon Mr. Day, of counsel for appellee, stated: "No, your Honor. We think it is irrelevant. We still admit that Mr. Staples thought that the man had authority." Mr. Hinton, counsel for appellant, then said: "Well, there is no issue of Mr. Staples's good faith, then." To this Mr. Herrick, of counsel for appellee, responded: "We do not hardly admit that, but we do claim that the state of mind of Mr. Staples has absolutely nothing to do with this case. The question is, Was there authority? We move to strike out anything along the line as to what Mr. Staples thought." It is too plain to admit of argument that counsel for appellee cannot now assume an attitude inconsistent with that then assumed, to the prejudice of appellant. The trial having proceeded upon the theory that the question of good faith was not material, appellee now is estopped

to raise the question. We may add, however, that we find nothing in the record upon which such a contention reasonably could be founded.

The learned trial justice disposed of the case upon the theory that appellant never acquired title to the warrant; that "his simply was the part of a guarantor of the prior indorsements for the purpose of having that check or draft deposited in the bank." The court further said: "The whole thing started in the bank. Mr. Ramsey was an agent acting for the bank. He was the one who was trying to find out whether that bank should take that check on deposit. That is all there was to it." We are unable to adopt this view of the case. Whorf had been sent here without funds on a mission for the company necessarily involving considerable time. He had contracted obligations, presumably legitimate, and his sole object in getting the power of attorney, so far as the evidence discloses, was to obtain the funds which he needed; in other words, to cash the warrant. Everybody understood that such was his object, and there is not a line of testimony, as we read it, inconsistent therewith. On the contrary, if all he sought was the deposit of the warrant in the Commercial Bank to the credit of the company, he might just as well have sent it to Seattle. The power of attorney, under which he was presuming to act, authorized him to "indorse, collect, receive, and receipt for" said warrant and to take all lawful ways and means "for the collection of said warrant." He already had the custody of the warrant as the agent and general manager of the company, and this power of attorney purported to give him authority to cash it, which he did. The mere fact that he elected to leave a portion of the money on deposit in the bank in no way changes the legal aspect of the transaction. He was entitled to receive it all in cash, and it is of no moment that he took enough merely to satisfy his obligations and left the balance on deposit.

Appellant clearly was an accommodation indorser, and sec. 1333 of the Code [31 Stat. at L. 1399, chap. 854] declares that "such a person is liable on the instrument to a holder for value notwithstanding such holder at the time of taking the instrument

knew him to be only an accommodation party." Appellant, being liable to the bank, and having fulfilled his obligation by taking up the warrant, occupies exactly the same position as the bank would have occupied. He is a holder for value.

We come now to the controlling question in the case, and that is, whether the company was bound by the indorsement of Whorf. It must be kept in mind that this was a close corporation, and that substantially all its stock was held by the Whorfs and Redelsheimer. The sole business of the corporation, so far as the record discloses, was the development of the coal mine which had been purchased from the Whorfs. Mr. Whorf, as general manager, unquestionably was the active head of the corporation. It probably was owing to these facts that, after the organization of the corporation was completed on March 3d, 4th, and 5th of 1913, no meeting of the board of directors was held until August 24, 1914. In other words, as the stock was all controlled by the Whorfs and Mr. Redelsheimer, the usual formalities were dispensed with and the business of the company conducted as a family or partnership affair. In such a situation, where the directors are the only shareholders and have knowledge of what is done, they are presumed to have acquiesced therein.

It is plain that the treasurer, having been a figurehead in the affairs of the company, must remain so here. That is to say, the company is not in a position to contend that under the by-laws certain authority was conferred upon him when, in fact, he was not called upon or permitted to exercise any.

What, then, was the situation as disclosed by the record when Whorf was sent here? The corporation had sustained a serious loss, and the general manager, without any formal authorization, but apparently with the knowledge and acquiescence of all concerned, was sent here to obtain an appropriation for the loss. At that time the president was living, so that no question can be raised as to Whorf's authority to undertake the mission, nor is there any denial of his statement that he was not provided with funds. In view of this situation, had the Treasury Department cashed this as well as the other warrant for Whorf upon his

statement of authority to receive payment thereon, there would be room for serious doubt as to the corporation's right to question the transaction. Thus, in *Buchwald Transfer Co.* v. *Hurst,* 111 Md. 572, 75 Atl. 111, 19 Ann. Cas. 619, the president of a business corporation owned nearly all its stock and exercised complete control over its affairs. No meetings of the board of directors had been held from the time of the organization until after the president and secretary had executed a chattel mortgage of the company's property to secure a loan, when the board passed a resolution disapproving the same. The directors were the only shareholders, and had knowledge of the manner in which the president had managed the concern and had acquiesced therein. The validity of the mortgage was sustained. The court said: "It is true that a president of a corporation does not ordinarily have authority to mortgage its property, unless authorized by the board of directors, but that authority may be implied under some circumstances." And in *Sheridan Electric Light Co.* v. *Chatham Nat. Bank,* 52 Hun, 575, 5 N. Y. Supp. 529, 127 N. Y. 517, 28 N. E. 467, where, as here, the stock was owned by three or four individuals, a committee of three was intrusted with the general management of the company's business, but was not specially authorized to indorse paper for the company. This committee, by power of attorney, delegated to one of its members authority to indorse certain checks and drafts, which were so indorsed and cashed by the bank. The authority of the committee was sustained. The court said: "The stock of the company was substantially owned by the three members of the committee, and by Mr. Sheridan, for the employment of whose inventions it was incorporated. And where that is the nature of the corporation, it is not essential that the selection of the committee should be by formal resolution of the board of trustees entered in their minutes. For it has been held that 'where a corporation consists of a small number of persons, like a partnership, they may transact all their business by conversation without formal votes. And it will be a violation of the plainest principles of justice to hold those who deal with them to prove all of their acts by regular votes.' (*Melledge* v.

*Boston Iron Co.* 5 Cush. 158, 51 Am. Dec. 59.)   It does not accordingly detract from the authority of the committee that no formal resolution has been found in the minutes of the proceedings of the board defining and declaring the limits of its authority." See also *Cunningham* v. *German Ins. Bank,* 41 C. C. A. 609, 101 Fed. 977; *Murphy* v. *W. H. & F. W. Cane,* 82 N. J. L. 557, 82 Atl. 854, Ann. Cas. 1913D, 643; *Marine Bank* v. *Butler Collier Co.* 1 Silv. Sup. Ct. 155, 23 N. Y. S. R. 319, 5 N. Y. Supp. 291; *Sun Printing & Pub. Asso.* v. *Moore,* 183 U. S. 642, 651, 46 L. ed. 366, 373, 22 Sup. Ct. Rep. 240; *Ford* v. *Hill,* 92 Wis. 188, 53 Am. St. Rep. 902, 66 N. W. 115.

However, we will deal with the case actually presented. The president of the corporation having died, the vice president, who under the by-laws possessed the same authority that the president would have possessed, executed the power of attorney to which we have referred. The question therefore comes down to this, Was the president of the company authorized to execute such an instrument in the circumstances disclosed? We think he was. The president and vice president were expressly authorized to sign bonds, deeds, and contracts, and the mere fact that a particular bank was made the depository of the funds of the company, and that the president was required to sign checks drawn on those funds, does not affect this transaction. Here, the general manager of the company had been intrusted with a special mission to a far distant point, and it was to be expected that his legitimate expenses would be paid by the company, whether he was successful or otherwise. If successful, the natural course to pursue was the one adopted, especially when we consider that Whorf was not only the general manager, but the business head of the corporation. Any other expedient would have been inconsistent with the whole course of conduct up to that time. The general manager having been sent here and having incurred legitimate obligations, his associates would have shown a lack of confidence in him had they required him to send the warrant to Seattle instead of having it cashed here.

Had the proceeds of the warrant been deposited in the bank at Seattle, the president or, upon his decease, the vice president,

could have withdrawn them, and, that being so, the power to cash the warrant could be delegated, since the exercise of such a power involved no judgment or discretion.    Thus in *Sheridan Electric Light Co.* v. *Chatham Nat. Bank,* 52 Hun, 575, 127 N. Y. 517, 5 N. Y. Supp. 529, the court said: "This committee, having itself power to indorse and negotiate paper payable to the order of the company, could delegate the same power by its united action to the witness Shephard, through the instrumentality of the power of attorney, for that involved no exercise of judgment or discretion on his part.    *   *   *   What was to be done was the performance of no more than ministerial acts, and the power to perform those acts could, in this manner, be confided by the committee to one of their number."

Whorf having had authority to cash the warrant, it was not incumbent upon either the bank or appellant to supervise his disposition of the proceeds.    From what they had learned, he theretofore had been permitted to exercise broad powers as general manager, and there was no reason for them to assume that he would not be faithful to his trust.    It is apparent from the letter which was written Whorf by direction of the board of trustees at its August, 1914, meeting, that he had been allowed wide latitude in the management of the company's affairs, for he was "required to give an accounting to the company for all moneys received and expended by you (him) as general manager or otherwise, since the organization of this company."    Certainly, in view of this and other evidence in the record, the company is not in position to complain because the bank and appellant did not question the good faith of Whorf.    Indeed, even now, it is by no means clear that if a balance should be struck, it would be in favor of the company rather than Whorf.

Viewing the case from any angle, we are impelled to the conclusion that this is an attempt by appellee, in a court of equity, to repudiate a transaction for which it was fully responsible, to the injury of one who had every reason to assume the regularity of that transaction and the existence of the authority conferred upon and exercised by appellee's agent.    The decree, therefore,

must be reversed, with costs, and the cause remanded with direction to enter a decree for appellant.

*Reversed and remanded.*